

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 11, 2017

**JAMES BRITT v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 08-05557     W. Mark Ward, Judge**

_____

**No. W2016-00928-CCA-R3-PC**
_____

The Petitioner, James Britt, appeals the denial of his petition for post-conviction relief from his premeditated first degree murder conviction, alleging he received ineffective assistance of counsel. After review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which TIMOTHY L. EASTER and J. ROSS DYER, JJ., joined.

Eric Mogy, Memphis, Tennessee, for the appellant, James Britt.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and D. Gregory Gilbert, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The Petitioner was convicted of the premeditated first degree murder of his wife and sentenced to life imprisonment. This court affirmed the trial court's judgment on direct appeal, and the Tennessee Supreme Court denied the Petitioner's application for permission to appeal. State v. James Britt, No. W2010-02090-CCA-R3-CD, 2012 WL 2022692, at *1 (Tenn. Crim. App. June 5, 2012), perm. app. denied (Tenn. Sept. 18, 2012).

The facts giving rise to the Petitioner's conviction were recited by this court on direct appeal as follows:

Kelly Czekalski spoke to her sister, Jennifer Britt (the victim), on February 24, 2008, sometime between 7:30 and 9:00 p.m. in a phone conversation. The victim was very upset and sounded as though she had been drinking or using drugs. Ms. Czekalski testified that she spoke with the victim for thirty to forty-five minutes and calmed her down. She said that the victim wanted to know the whereabouts of her daughter, who had been staying with the victim's aunt in Wisconsin. Ms. Czekalski's grandmother later called her around 2:00 a.m. and said that the victim had been killed.

Kristi Tackett, the victim's neighbor, testified that during the day on February 24, 2008, she and her children were looking out a back window and saw the victim and [Petitioner] fist fighting in their front yard. The two then went inside the house and came back out around dark and continued fighting. Ms. Tackett explained that the victim and [Petitioner's] house did not have any electricity, and the couple used the street light between the two houses for light. Ms. Tackett saw the victim hit [Petitioner] in the face "with something or her hand." She testified that the victim and [Petitioner] then went back inside the house and continued fighting, and she then heard two gunshots approximately twenty minutes later. Ms. Tackett testified that some other neighbors called police, and she saw "the big guy" who lived with [Petitioner] and the victim run outside, and he was "running in circles saying he shot her." When police arrived on the scene, Ms. Tackett told an officer what she had heard. Ms. Tackett testified that [Petitioner] and the victim "would fight all the time."

Renee LaMondue, a communications supervisor for the Memphis Police Department, testified concerning the 911 call of the shooting. She said that a female neighbor called the police department for a "male neighbor, stating that the male can't speak with us, stating that he has accidently shot his wife in the head."

Officer Joseph Johnson of the Memphis Police Department was the first officer on the scene. There were a "handful" of people in the front yard of the residence, and he spoke to [Petitioner] who said that he had accidently shot his wife. Officer Johnson went inside the residence, which was dimly lit, and saw the victim lying on a bed located to the left side of the door in the living room. He saw that the victim had a gunshot wound to her head, and he immediately "backed out" of the house and secured the scene. Officer Johnson testified that the house was messy and "extremely dirty."

Daryl McConnell, a firefighter paramedic for the Memphis Fire Department, responded to the scene of the shooting. He walked inside the residence and saw the twenty-five-year-old victim lying on her right side in the bed with a gunshot wound to her head. "She had no pulse, was not breathing, was not moving. Her lips were purple, had the beginning stages of lividity, which is basically purpleness around the chest area, which is indicative of no circulation in the body." Mr. McConnell testified that he placed a heart monitor on the victim, and it showed no electrical activity in her heart. There was a .357 Magnum revolver lying on the bed.

Crime scene investigator Marlon Wright secured the evidence and photographed the scene. He found the victim lying in the bed fully clothed with a gunshot wound to the back of her head, and the pistol was lying next to her. Officer Wright testified that the house did not have electricity, and he and other officers used several flashlights to light the area. He examined the gun and found blood and human tissue on the barrel and cylinder. Officer Wright looked inside the cylinder and noted that two of the six rounds had been fired. He said that one of the fired bullets was at the twelve o'clock position and the other was at the six o'clock position. Officer Wright also noted that if a gun had been fired twice in rapid succession, the bullets would have fired in order. Gunshot residue tests were obtained from [Petitioner] and Timothy Britt and sent to the Tennessee Bureau of Investigation (TBI) for analysis. Officer Wright testified that the house was disorganized and cluttered with a small walkway from the front door to the bed.

Crime scene investigator Thomas Ellis was called to the scene and recovered two .357 spent shell casings from the residence. He could not determine when the casings were fired.

At the scene, Officer Robert Tutt of the Felony Response Unit spoke with [Petitioner's] brother, Timothy Britt, who lived with [Petitioner] and the victim. He described Mr. Britt as having "a very limited mental capacity," and he was only able to tell Officer Tutt that he was in the house and heard a gunshot. Mr. Britt was later driven to the police department where he gave a statement.

Detective William Merritt of the Homicide Squad was asked to help interview [Petitioner] on February 25, 2008. At the time of the interview, he said that [Petitioner] had some cuts and abrasions to his face. One eye

was blackened and swollen, and he had scratches and abrasions on his nose. [Petitioner] signed a waiver of rights and agreed to talk to officers. [Petitioner] told Detective Merritt that he and the victim had been married a little more than a month and had lived at 1542 Tennyson Road "[a]bout two weeks before [they] got married at the most." He said that his brother, Timothy Wilson Britt, also lived in the residence. [Petitioner] said that he accidentally shot the victim one time while she was lying on the bed with his ".357 Magnum, 2-inch sub-nose Rossi stainless steel." He thought that he had owned the gun approximately a week before the shooting or "[m]aybe longer." The victim owned a .380 caliber pistol that was purchased approximately three days before [Petitioner] bought his gun. [Petitioner] said that he and the victim usually kept their guns and ammunition under the pillow. He told Detective Merritt that he last fired his .357 Magnum the day before or a couple of days before the shooting because he had fired only "twice before that." He also said that he fully reloaded the gun after shooting it. [Petitioner] testified that the victim also fired her weapon the day before or a couple of days before the shooting both inside and outside of the house.

Concerning the circumstances of the shooting, [Petitioner] gave the following statement:

> We come in and she was getting ready to prepare dinner. We was lying on the bed. We started having sex but we didn't finish because she said, quote, I seen a shadow, end quote. That's when I got up, got my gun, went outside. I seen a figure go down between the house and a truck so I went after the figure for a little bit but he took off running. He went through the backyard and through the fence and disappeared. By that time maybe 45 seconds to a minute went by and I come back in. She asked me who it was – or who was it and I said I don't know. And I was coming around the kerosene heater, tripped over a flashlight or a bowl and that's when I fell down over the bed close to her. When my head hit, the gun went off 'cause I lost my balance. Then I shook her arm just a little bit to see but I couldn't get no response. I could tell she was breathing just a little a little [sic] so I looked for the cell phone and couldn't find it. It was too dark. So I woke my brother up. I thought he was in the bed but apparently he was in the bathroom. I told him to stay in the living room 'cause I was running across the street to

use a telephone but he followed me out on the porch. While I was using the telephone, the neighbors were calling 911. The police pulled up maybe a minute and a half later. I didn't get to make it back in the house.

[Petitioner] said that he was "[m]aybe a foot or foot and a half" from the victim when the gun discharged, and he was not leaning over or touching her at the time. He said that the injuries to his face occurred when he "tripped and slammed face first into the gun and it went off."

[Petitioner] told Detective Merritt that he and the victim had not been arguing before the shooting and that the victim was upset because "her Aunt Kay would not let her talk to her daughter for 10 days." He also said that the victim had never struck or attacked him. [Petitioner] noted that he might "be wrong on the two shots 'cause I don't remember shooting but one." [Petitioner] did not mention that he or the victim had been drinking. Because of some inconsistencies in [Petitioner's] statement, Detective Merritt asked him to draw a sketch of the scene. Detective Merritt noted that although [Petitioner] said that he and the victim began having sex before the shooting, she was fully clothed and wearing "army-type boots" and a coat. [Petitioner] also said that he did not have a cell phone and indicated that 1542 Tennyson was an abandoned house with no electricity.

Dr. Marco Ross, Deputy Chief Medical Examiner, performed an autopsy on the victim. He determined that she died from a "contact gunshot wound with a contact entrance wound behind the left ear." Because there was "soot deposition in and on the edges of the wound" and lacerations to the skin around the wound, Dr. Ross concluded that the muzzle of the weapon was in contact with the victim's skin. He testified that the "bullet tract had perforated and fractured the skull as well as perforated the brain." Dr. Ross opined that the victim died immediately or within a few seconds of being shot. Concerning the victim's other injuries, Dr. Ross noted:

> She had several contusions or bruises, including one on the left side of the neck, one on her left upper back, one on the inner front part of the right thigh, one on the inner front part of the right knee, several contusions on front of the lower legs as well.

-5-

The victim's right shin had bruises from her knee to her ankle, and there was also a bruise on the back of her left arm. There was some alcohol present in the victim's blood at a level of 82 milligrams per deciliter, which corresponded to approximately .08 on the Breathalyzer scale. Sergeant Paula Harris of the Memphis Police Department picked up a bullet pack, a gunshot residue kit performed on the victim, and the victim's clothing from the morgue. She explained that a bullet pack contains either "a fragment or an entire projectile or a jacket, some piece of a bullet that the medical examiner takes."

Agent Steve Scott, of the TBI Firearms Identification Unit, examined the ballistics evidence in this case. Concerning [Petitioner's] gun, Agent Scott testified:

> The .357 Magnum is the caliber of the revolver. It is a double-action revolver, meaning there are two ways this gun can be fired once it's loaded. Cartridges are loaded into the cylinder. It is then rotated up and closed. The first way to fire that would be to thumb back or pull back the hammer and then pull the trigger. That motion is called single-action firing because when you pull the trigger, the gun does one action, allowing the hammer to fall. The other way to fire this particular revolver is simply just to load it, close the cylinder and pull the trigger. That is the double-action mode of firing. And double-action mode actually rotates a cartridge into the firing position, cocks the hammer and also allows it to fall.

Agent Scott noted that the "double-action trigger pull" takes "approximately 15 pounds of pressure pulling with the finger in order to cause the weapon to discharge." He further said, "It would be my opinion that the 15 pounds would have to be applied with some intention." Agent Scott testified that single-action firing would require approximately 3 and 3/4 pounds of pressure on the trigger after the hammer was cocked to fire the weapon. Concerning accidental firing in a single-action pull, Agent Scott said:

> I wouldn't think it would be accidental to cock the gun and actually pull the hammer back into that cocked position. However, I can somewhat see with the finger on the trigger

and a struggle or something of that nature, any squeezing of the hand could cause the gun to discharge.

Agent Scott testified that the revolver had a six-chambered cylinder that contained two fired cartridges and four unfired cartridges, one of which had a "very small indentation on the primer surface that could be a partial firing pin impression." He explained that a "partial firing pin impression is just simply where the firing pin of the gun just barely has an impact on that primer, not enough to cause a detonation of the primer." He said that there was a possibility that the partial impression was caused by some "play" on the hammer of the gun. Agent Scott testified that one of the fired bullets in the revolver was in the twelve o'clock position and the other was in the six o'clock position. Concerning the firing sequence, he said:

Well it's not the normal firing sequence to have fired two shots in succession. [sic] As you can see, here is one fired cartridge case and here is the other fired cartridge case. They're opposite each other. Normally if two shots are fired one right after another, say one cartridge case would be here, the next would be here. This particular cylinder and the style of gun, when the cylinder rotates to bring the next cartridge in line, it rotates counter-clockwise so from right to left the top of this moves. So this cartridge – if this one was the first one fired, then this one would be the second one to be fired. And if that were the case, then this cartridge case is out of place. It should be here rather than down here in the five [sic] o'clock position.

Agent Scott surmised that the unusual location of the fired bullets could be due to the cylinder being rotated between shots being fired, or by the cylinder being emptied and the bullets and spent shells being replaced.

Agent Scott examined the bullet recovered from the victim and a bullet fragment. He determined that the bullet was fired from [Petitioner's] weapon. He was unable to determine whether the fragment was fired from [Petitioner's] weapon "because of its size and the lack of a very prominent rifling on it."

Agent Scott testified that he reviewed the gunshot residue kits from the victim, Timothy Britt, and [Petitioner]. He explained that the examination of the kits were performed by other TBI scientists. On

[Petitioner's] kit, the results indicated that "no controlled swabs were submitted, therefore no analysis was performed," and the results from Timothy Britt were inconclusive.

Id. at *1-5.

The Petitioner filed a pro se petition for post-conviction relief, as well as several amended petitions through appointed counsel. Among other things raised in his petitions, the Petitioner raised the allegations of ineffective assistance of counsel pursued on appeal: trial counsel was ineffective in his cross-examination of Kristi Tackett, the victim and the Petitioner's neighbor, and for not retaining ballistics and blood spatter experts for trial.

The post-conviction court conducted an evidentiary hearing, at which the Petitioner testified that he thought that trial counsel "could have done better." The Petitioner elaborated that Ms. Tackett claimed to have seen him and the victim fighting, but she "had trouble seeing" and could not identify him in the courtroom. Therefore, he thought trial counsel could have done a better job cross-examining her. The Petitioner claimed there was no fight between him and his wife, contrary to Ms. Tackett's testimony at trial. However, he acknowledged that his wife's body had visible bruising and injuries, and that his own face had signs of injury. The Petitioner claimed that his injury occurred when the gun hit his face as it discharged, but he admitted that this explanation differed from his telling the police that he got hurt when he tripped going back into his house after looking for an intruder.

The Petitioner also claimed that his friend, Jack Pope, could have verified there was no fight between him and the victim because Mr. Pope was with them until thirty minutes to an hour before the shooting. The Petitioner told trial counsel about Mr. Pope, but trial counsel did not call Mr. Pope as a witness at trial. The Petitioner did not bring Mr. Pope to the post-conviction hearing because he heard that Mr. Pope had passed away.

The Petitioner admitted that he shot his wife but maintained that it was an accident and that his defense at trial was probably that the shooting was an accident. Although the shooting was accidental, the Petitioner said that he lied to the police about what happened because he was afraid of going to jail. He wanted trial counsel to suppress his false statement to police, elaborating that he told the police that he had his gun because he heard an intruder, but that was not true. The Petitioner explained what really happened was that he took his gun out of his truck and went inside to put it away when he saw his wife trying to place a picture on the wall and jumped onto the bed to help her. He said that the bed started shaking, and as they grabbed each other, "the gun went off." The Petitioner admitted that he had not told anyone that version of the incident prior to the

post-conviction hearing. The Petitioner claimed that only one bullet was fired, even though his brother, who was in the house at the time, told the police he heard two or three shots. The Petitioner claimed his brother was mentally challenged.

The Petitioner stated that he had wanted trial counsel to call ballistics and blood spatter experts to prove that he and his wife were standing when his gun discharged, refuting the State's evidence that his wife was lying down when she was shot. However, the Petitioner admitted that he had not talked to any such experts and did not bring an expert to testify at the hearing. The Petitioner acknowledged that the State's expert testified that the gun was touching his wife's head when it was fired, and he did not have any proof to rebut that testimony.

The Petitioner stated that he wished he had testified at trial, but he acknowledged that it was his decision not to testify and that the trial court questioned him regarding his decision. The Petitioner admitted that, had he testified at trial, there were witnesses who could have been called to testify about other fights he had with his wife. The Petitioner believed the outcome of the case would have been different had trial counsel "done a better job."

Trial counsel was not called to testify at the post-conviction hearing.

Following the conclusion of the hearing, the post-conviction court entered an order denying the petition. The Petitioner appealed.

## ANALYSIS

The Petitioner argues that he received ineffective assistance of counsel because trial counsel did not thoroughly cross-examine his and the victim's neighbor, Kristi Tackett, or present testimony from ballistics or blood spatter experts.

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is de novo, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed de novo, with a presumption of correctness given only to the post-conviction court's

findings of fact.  See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding.  Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee).  The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms."  Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

The Petitioner argues that trial counsel was ineffective for failing to cross-examine Ms. Tackett "more rigorously" regarding her ability to see the fight between him and the victim.  He asserts that, "[i]f the jury did not believe that the fight ever occurred, then they may not have returned a verdict of not [sic] guilty."  As to this allegation, the post-conviction court noted that the Petitioner did not call Ms. Tackett as a witness at the post-

conviction evidentiary hearing and "offered no specifics as to how 'better' cross examination would have helped his case." The post-conviction court ruled that "[a]s a result, this court is left to speculate as to what 'better' cross-examination would have revealed" and, therefore, that the Petitioner failed to prove deficient performance or prejudice.

The record supports the post-conviction court's determination. The record is clear that trial counsel cross-examined Ms. Tackett. The record is also clear that Ms. Tackett was unable to identify the Petitioner at trial, and the jury witnessed her inability to do so. The Petitioner's testimony at the post-conviction hearing indicated that trial counsel believed that Ms. Tackett's failure to identify the Petitioner spoke volumes to the jury. Moreover, the Petitioner did not present Ms. Tackett's testimony at the post-conviction hearing to show how she would have responded had trial counsel asked about her inability to see the fight. Absent such testimony, any assumption about what she would have said at trial is speculative at best. Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). The Petitioner has failed to prove that trial counsel rendered deficient performance or that there is any reasonable probability of another outcome had trial counsel cross-examined Ms. Tackett differently.

The Petitioner also argues that trial counsel was ineffective for failing to hire a ballistics and/or blood spatter expert. He asserts that such experts could have established that he shot his wife while they were standing up, not when she was lying down. However, he admitted that he had not talked to any expert who could rebut the finding that the muzzle of his gun was pressed against his wife's head when it was fired, and he admitted that he may not have ever told trial counsel the version of his story that he and his wife were both standing up as opposed to lying down.

With regard to this assertion of trial counsel's ineffectiveness, the post-conviction court found that the Petitioner failed to show deficient performance or prejudice because he did not present the testimony of a ballistics or blood spatter expert at the post-conviction hearing, admitted he had not consulted such experts and "was merely speculating as to whether they would have helped his case." We agree with the finding of the post-conviction court. In order to succeed on a claim that counsel did not properly investigate or call favorable witnesses at trial, a petitioner must generally elicit favorable testimony from those witnesses at the evidentiary hearing, as a post-conviction court may not speculate "on the question of . . . what a witness's testimony might have been if introduced" at trial. Black, 794 S.W.2d at 757. The Petitioner has failed to prove this claim.

-11-

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the denial of the petition.

_____
ALAN E. GLENN, JUDGE